Harry Broadus sought to recover damages for tort liability based on the criminal acts of a third party. The trial court entered a summary judgment for the defendants, Chevron USA, Inc. and Larry Ayres d/b/a Regency Chevron gasoline station and store. Broadus appealed.
A shooting and robbery attempt occurred just after midnight on the morning of February 21, 1992, at Regency Chevron, a dealer-leased service station-store located at 4686 Airport Boulevard in Mobile. Broadus, a customer of the store, was rendered a permanent paraplegic by the shooting.
Broadus stated the following in his answers to interrogatories:
 "I had stopped at Regency Chevron, in Mobile, Alabama, to get gas and a two-liter soft drink. I was at the counter, talking to the cashier, Richard Umfleet, when a man entered the store and asked for a pack of cigarettes. Mr. Umfleet got the cigarettes for him. The man began shooting. He shot Mr. Umfleet first, and then he shot me. When I was hit, my legs went numb and I fell to the floor. The time was shortly after midnight.
 "To the best of my knowledge, Regency Chevron had a door which could be locked from the cashier area, a pass-through drawer, and some type of bullet-resistant glass in the windows.
". . . .
 "I think there were one or two customers at the store between the time of my *Page 201 
arrival and the alleged assault. I believe they had left the area before the man came in and shot us.
 "I had planned to get gas when I arrived at the station; however, it was windy and cold, and I had half a tank of gas, so I decided to postpone this. I went into the store to get a two-liter drink. I was standing at the counter, talking to Mr. Umfleet, at the time I was shot."
(C.R. at 509-10.)
Larry Ayres had leased the store premises from Chevron USA, Inc., and was doing business under the name "Regency Chevron." Chevron USA owned the premises and had remodeled them as a "foodmart" in the 1980's. Chevron USA imposed certain restrictions and regulations upon Ayres.
Chevron furnished the foodmart with all equipment and furnishings, including office furniture, shelving, coolers, cash register, signs, and decals. From time to time, Chevron inspected the premises and the operation. Chevron required that the store be open for business 24 hours per day, seven days per week. Chevron required Ayres to attend training programs, which included training about robbery prevention.
Chevron regulated the types of merchandise sold at Regency Chevron and the business that could be conducted there. Chevron was responsible for purchasing, installing, and maintaining certain equipment at the store, including robbery prevention hardware.
In 1988, Chevron implemented a foodmart security program, focusing upon robbery prevention. Under this program, Chevron performed crime risk assessments of its foodmarts to determine the likelihood of a customer or employee's being the victim of a robbery or other violent crime. Chevron also began training programs for its employees and lessees, required that certain security hardware be installed, and set in place procedures designed to prevent crime.
Chevron, through its Chevron Corporate Security Unit, required that its retail facilities be evaluated and that security recommendations be made to the Chevron Marketing Department to protect customers and employees. These recommendations were based on the risk of various crimes occurring; those risks were determined by the Security Unit. The Marketing Department had the responsibility to carry out the recommendations and was provided the necessary funding for doing so. Chevron's security manual indicates that Chevron took responsibility for good security practices.
Chevron implemented risk assessments as to each of its retail establishments nationwide to evaluate the likelihood of robbery or other crimes occurring and to implement measures to minimize that likelihood. Among such measures were improved lighting, particularly during late evening or early morning hours, certain push-button door locks, and dead bolts that could be operated by a cashier, a bullet resistant exterior at cashier locations, an exterior transaction drawer, a time-delay cash dispenser, floor safe in the back office, a view device in the back room door, locks on beer coolers, robbery prevention decals, and use of robbery training procedures, including keeping only a minimum amount of cash on hand at the cashier's desk or register.
Chevron began this program in 1988, and by 1991 it had begun assessing the implementation of its security recommendations.
In January 1990, Chevron's regional office in Atlanta received an assessment of some 20 service station/foodmarts in the Alabama-Mississippi area. The stations were rated "low," "medium," or "high" (C.R.281); the Regency Chevron station was rated "medium."
Thirteen suggested improved security measures were sent to various locations (Broadus Exhibits 67, 91, and 71); by 1990 Regency Chevron had incorporated eleven of these. (Bowers Dep. 197-199) (Toliver Dep. 225). The security assessment did not recommend any further security procedures. (Bowers Dep.) As a result of new security measures implemented by Chevron from 1988 to 1994, Chevron found that robberies dropped from 314 to 104, or about 66 percent. (Berry Dep. 119.)
There had been no shootings at Regency Chevron before the shooting that injured *Page 202 
Broadus. (Ayres Dep. 146.) Also, there had been no violent assaults there within the 12 months preceding this incident on February 21, 1992. (Ayres Dep. 156.)
The only known criminal activities at this location were a few "drive offs" (a party fills a car with gasoline and departs without paying), shoplifting, one case of criminal mischief, resulting in damage to Regency Chevron's property, and one instance of an individual's grabbing money from the cash register. (Ayres Dep. 109.) (Umfleet Dep. 37-39.)
Broadus presented no evidence of previous shootings or violent crimes occurring on the premises of Regency Chevron. Moreover, Broadus presented no crime statistics or other data to show either the frequency or the nature of prior criminal acts occurring at this station.
In Saccuzzo v. Krystal Co., 646 So.2d 595 (Ala. 1994), this Court stated the general rules regarding motions for summary judgment and claims of liability based on third-party criminal activity:
 "One moving for a summary judgment has the initial burden to make a prima facie showing that there is no genuine issue of material fact (i.e., that there is no dispute as to any material fact) and that the movant is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.; see also Willingham v. United Insurance Co. of America, 642 So.2d 428 (Ala. 1994), and the cases cited therein. ' "The burden does not shift to the opposing party to establish a genuine issue of material fact until the moving party has made a prima facie showing that there is no such issue of material fact." ' Willingham, 642 So.2d 428, quoting earlier cases.
 "Rule 56 must be read in conjunction with the 'substantial evidence rule,' § 12-21-12, Ala. Code 1975, for actions filed after June 11, 1987. See Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). In order to defeat a defendant's properly supported motion for summary judgment, the plaintiff must present substantial evidence, i.e., 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
 "The general rule in Alabama is that 'absent special relationships or circumstances, a person has no duty to protect another from criminal acts of a third person.' Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368, 1370 (Ala. 1986). 'Special circumstances' exist only when the defendant 'knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff.' Nail v. Jefferson County Truck Growers Association, Inc., 542 So.2d 1208, 1211 (Ala. 1988). For the 'special relationship' exception to apply, there must be a relationship either between the premises owner and the third party or between the premises owner and the plaintiff. Young v. Huntsville Hospital, 595 So.2d 1386 (Ala. 1992), citing Restatement (Second) of Torts § 315 (1965). Prior criminal incidents can indicate knowledge on the part of the owner, but such incidents are by no means conclusive on the question of knowledge. Williams v. First Alabama Bank, 545 So.2d 26, 27
(Ala. 1989).
 "The past rulings of this Court indicate that it is difficult for the plaintiff to overcome the defendant's properly supported motion for summary judgment in an action alleging liability on the part of a premises owner for the criminal acts of a third party."
646 So.2d at 596-97.
In Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368
(Ala. 1986), this Court gave a detailed explanation of when this type of duty may arise:
 "In Henley v. Pizitz Realty Co., [456 So.2d 272
(Ala. 1984)], plaintiff sued the owner of a parking deck where she was attacked, alleging negligence and wantonness on the part of the defendant in maintaining its security system. The trial court granted summary judgment in favor of defendant premises owner, finding that the premises owner had no duty to protect against the criminal acts. On appeal, *Page 203 
plaintiff urged this Court to adopt the standard espoused by the Restatement (Second) of Torts § 344 (1965), which imposes on the premises owner a generalized duty to discover, warn against, and protect against the criminal acts of a third party. This Court affirmed the summary judgment, refusing to adopt the Restatement principle of initial legal liability. Instead, this court espoused the rule imposing no initial legal duty upon the defendant premises owner to protect against the criminal acts of a third party.
 "There is a singular exception to this general rule, which arises where the 'particular criminal conduct was foreseeable.' Henley v. Pizitz Realty Co., supra, at 276. Stated differently, '[t]his Court has recognized that a duty may be imposed on a store owner to take reasonable precautions to protect invitees from criminal attack in the exceptional case where the store owner possessed actual or constructive knowledge that criminal activity which could endanger an invitee was a probability.' Ortell v. Spencer Companies, [477 So.2d 299, 299 (Ala. 1985)].
 "This Court has recognized that it is indeed difficult to impose such a duty, not yet having been presented the case whose facts command a finding of such a duty.
 "A second reason we have generally refused to impose liability on premises owners for the criminal acts of third parties is the usual absence of 'proximate cause'; it is the independent, intervening criminal act that is generally the proximate cause of plaintiff's injuries and not any action or inaction on the part of the premises owner. In Latham v. Aronov Realty Co., [435 So.2d 209, 211 (Ala. 1983)], this Court quoted Vines v. Plantation Motor Lodge, 336 So.2d 1338, 1339 (Ala. 1976):
 " 'Negligence alone does not afford a cause of action. Liability will be imposed only when negligence is the proximate cause of injury; injury must be a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury. If, between the alleged negligent act or omission and the injury, there occurs an independent, intervening, unforeseeable event, the causal connection between the alleged negligence and the injury is broken. Mobile City Lines, Inc. v. Proctor, 272 Ala. 217, 130 So.2d 388 (1961). . . .
 " 'The key here is foreseeability. This court has held many times that a person, who by some act or omission sets in motion a series of events, is not responsible for consequences of intervention of another agency, unless at the time of his original act or omission, the act of the intervening agency could reasonably be foreseen. If so, the causal chain is not broken. If the injury results from an independent intervening, efficient cause, not reasonably foreseeable, the original negligent act or omission is not the proximate cause of injury. . . .'
 "In spite of police protection and security services of whatever type or form, criminal acts continue to be committed and this is a problem which confronts this society's citizens individually and as a whole. As this Court pointed out in Parham v. Taylor, [402 So.2d 884, 886
(Ala. 1981)], quoting from Thoni Oil Magic Benzol Gas Stations, Inc. v. Johnson, 488 S.W.2d 355
(Ky. 1972):
 " ' "In spite of police protection afforded by the state it is a fact of life that citizens are sometimes assaulted, beaten, robbed, raped or murdered at home, at work or on the streets. This is a problem which confronts all citizens equally and for which there is often no civil remedy." ' "
499 So.2d at 1371-72.
Chevron USA and Ayres had no duty to protect Broadus from the criminal acts of a third party. Broadus presented no evidence to show that Chevron USA, or Ayres d/b/a Regency Chevron knew or should have known that Broadus was in danger of being shot by someone in Chevron's store. No "special circumstances or relationship" existed between Broadus and Chevron USA or Ayres d/b/a Regency Chevron. In some other cases noted in this opinion, the plaintiff presented evidence of an extremely high level of criminal activity at the locations *Page 204 
at which the plaintiffs had been injured, but the plaintiff did not present such evidence in this case. To the contrary, only minor criminal activity was shown to have occurred at Regency Chevron in the 12 months preceding Broadus's injury.
Broadus also argues that he was a business invitee of Chevron and Larry Ayres d/b/a Regency Chevron and argues that a "special relationship" existed between him and the defendants. As above noted, no special relationship was established by the facts of this case. No evidence suggested "special circumstances" or a "special relationship" between Broadus and Chevron USA or Ayres analogous to the relationships and circumstances that existed in Thetford v. City of Clanton,605 So.2d 835 (Ala. 1992), and Young v. Huntsville Hospital,595 So.2d 1386 (Ala. 1992).
The summary judgment in favor of Chevron USA, Inc., and Larry Ayres d/b/a Regency Chevron is affirmed.
AFFIRMED.
MADDOX, HOUSTON, and KENNEDY, JJ., concur.
COOK, J., concurs in the result.
BUTTS, J., dissents.