Theodore J. HOFFMAN and Deborah
L. Hoffman, Appellants,

v.

UNION ELECTRIC COMPANY, d/b/a
AmerenUE, Respondent.

No. SC 86716.

Supreme Court of Missouri,
En Banc.

Nov. 22, 2005.

Stephen F. Meyerkord, Steven D. Rineberg, Doreen A. Graham, St. Louis, MO, for appellants.

James J. Virtel, Ann E. Buckley, Armstrong Teasdale LLP, St. Louis, MO, for respondent.

STEPHEN N. LIMBAUGH, JR., Judge.

Theodore and Deborah Hoffman appeal the entry of summary judgment disallowing their claim of negligence against Union Electric Company (UE) for the wrongful death of their daughter. After opinion by the Court of Appeals, Eastern District, this Court granted transfer. Mo. Const. art. V, sec. 10. The judgment is affirmed.

Appellants' daughter, Tiffany Hoffman, was fatally injured when an automobile in which she was a passenger veered out of control, struck a UE electric pole, overturned, and then caught fire after an energized power line fell on it. UE's computer monitoring system recorded an alarm with respect to the downed power line, and less than a minute later the electrical circuits "locked open," de-energizing the circuits so that no current was flowing through the line. Emergency personnel arrived at the scene at about the same time but, upon finding the power line looped over the undercarriage of the vehicle, they did not immediately extricate Tiffany who was trapped inside. Several UE employees were dispatched to the scene, including a line service worker, but a UE construction supervisor was the first to arrive, about 25 minutes after the power line had been de-energized. Although company safety regulations and industry standards direct that employees should refrain from working on downed power lines until they are "isolated and grounded," the supervisor did not have the proper equipment to do so, having come straight from his house in his personal vehicle. Nonetheless, relying on his experience and knowledge that the system is designed to de-energize under these circumstances, he obtained a fiberglass stick from a fire truck and removed the power line. At that point, the emergency personnel removed Tiffany from the vehicle and transported her to a hospital. She died several weeks later. Thereafter, her parents filed this wrongful death action.

■■■ Appeals from summary judgment are essentially reviewed *de novo*. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). To be entitled to summary judgment, the moving party must demonstrate that: (1) there is no genuine dispute as to the material facts on which the party relies for summary judgment; and (2) on those facts, the party is entitled to judgment as a matter of law. Rule 74.04. A defendant may establish a right to summary judgment by showing that the plaintiff is unable to produce sufficient evidence to establish one or more of the essential elements of the plaintiff's claim. *ITT Commercial Finance Corp.*, 854 S.W.2d at 381. Finally, on appeal, the court "will review the record in the light most favorable to the party against whom judgment was entered." *Id.* at 376.

■■■ In their petition, appellants allege that UE was negligent in failing to promptly inform emergency personnel "that it was safe to render medical care to decedent at the scene of the crash" and that UE's negligence was the cause of decedent's death. In their briefs and at oral argument, appellants revised their argument to allege that UE had a duty to inform emergency personnel that the power line had been de-energized, thus greatly reducing the risk of injury, not that the situation was altogether safe. In that way,

appellants argue, emergency personnel could have made their own informed decision whether to extricate the decedent, and they allege that at least one of the emergency personnel was prepared to do so. To the contrary, UE maintains that Missouri law has never recognized a duty to provide information enabling emergency personnel to approach downed power lines before standard safeguards have been implemented.

Of course, in order for a plaintiff to make a submissible case of negligence, a plaintiff must establish that there was a duty and that the breach of that duty was the proximate cause of his injury. *Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo. banc 1993). "Whether a duty exists is purely a question of law." *Lopez v. Three Rivers Electric Cooperative, Inc.*, 26 S.W.3d 151, 155 (Mo. banc 2000). "The judicial determination of the existence of duty rest on sound public policy." *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.*, 700 S.W.2d 426, 431 (Mo. banc 1985). In considering whether a duty exists in a particular case, a court must weigh the foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against it and the consequences of placing that burden on defendant. *Gunnett v. Girardier Bldg. and Realty Co.*, 70 S.W.3d 632, 639 (Mo. App.2002); *Benoit v. Missouri Highway and Transp. Com'n*, 33 S.W.3d 663, 668 (Mo.App.2000).

At the outset, it must be made clear that appellants do not criticize UE's computerized system for de-energizing the power lines, nor its operation in this instance; nor do they criticize the timeliness with which UE personnel arrived at the scene and removed the power line. Instead, they seek to impose a duty on UE to inform rescue workers that the risk of harm was very low should they, themselves, come in contact with the power line, with the expectation that the rescue workers would act to save the victim despite the risk.

This argument, however, disregards the fact that the risk of harm, though greatly reduced, was still so significant that UE, as noted, directed its employees to avoid contact with downed power lines unless the lines have been "isolated and grounded." These are procedures that require specialized tools and training, as well as adequate time for implementation. In fact, these same or similar safety procedures are required under government and industry standards. For instance, Occupational Safety and Health Administration (OSHA) regulations mandate that employees must treat power lines that have been de-energized, but not "locked out or tagged," as "energized parts." 29 CFR 1910.333(b)(1). OSHA regulations also prohibit employees from working on exposed de-energized parts before a qualified worker has used "test equipment to . . . verify that the circuit elements and equipment parts are de-energized," 29 CFR 1910.333(b)(2)(iv)(B); or from working near de-energized overhead lines before they have been grounded or otherwise secured, 29 CFR 1910.333(c)(3). In much the same way, section 420–D of the National Electrical Safety Code states: "Employees shall consider electric supply equipment and lines to be energized unless they are positively known to be de-energized." Even appellants' expert testified that UE's standards are consistent with industry practice and that the standards are in place because it is possible for a power line to become re-energized.

According to the uncontradicted evidence, a line may re-energize because of an equipment malfunction, or a lightning strike, or a "crossing line" down the road that falls on a previously de-energized line,

or even because of a customer's back-up generator that has come on line in response to a power outage and "backfeeds" through the downed line. As UE's regional dispatcher put it, there was one instance in which a line had been re-energized and "just burned a couple of guys and one of them happened to be a good friend of mine, so I know that it happens."

The possibility that a line will re-energize, though quantitatively "very remote" as appellants' expert described it, carries with it, of course, a qualitative risk not simply of injury, but of death. To be sure, the UE standards, government standards, and industry standards were promulgated to address that very concern. Ultimately, that is the reason why the concept of duty should not be extended to the situation at hand. If, according to these public policy-based standards, it was unsafe for UE's trained employees to remove a downed power line even though the line was de-energized, then UE should have no duty to inform emergency personnel otherwise.

The dissent rightly stresses the societal interest in preserving human life. However, the dissent conveniently ignores the fact that OSHA regulations, industry standards and UE's standards were all designed to protect human life from the danger presented by electricity in these very circumstances. Accordingly, the law *has* recognized the interest in preserving human life and, with that interest in mind, does not require UE to put more lives in danger by giving emergency personnel a reason to approach a downed power line.

Finally, the fact that the UE construction supervisor who, as the first UE employee on the scene, safely removed the line, has no bearing on the duty analysis.

Suffice it to say that he was fully aware of the company standards and the risk involved, and by his own testimony, he simply disregarded them.

In conclusion, this Court holds that UE had no duty to inform emergency personnel that the power line was de-energized. The judgment is affirmed.

WOLFF, C.J., STITH, PRICE and RUSSELL, JJ., concur.

WHITE, J., dissents in separate opinion filed; TEITELMAN, J., concurs in opinion of WHITE, J.

RONNIE L. WHITE, Judge, dissenting.

I respectfully dissent. "In the absence of a particular relationship recognized by law to create a duty, the concept of foreseeability is paramount in determining whether a duty exists."[1] For purposes of determining whether a duty exists, this Court has defined foreseeability as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it.[2]

The risks to human life when engaging in the inherently dangerous activity of transmitting electrical power are readily discernable. Indeed, this Court has already held that when a utility company has actual notice that any of its wires have become dangerous, that the company must exercise the highest degree of care and has a duty to repair any break in the line or shut off the electricity within a few short minutes.[3]

UE's power lines run adjacent to the roadway and it is an unquestionably foreseeable risk that a motor vehicle accident

1. *Lopez v. Three Rivers Electric Cooperative, Inc.,* 26 S.W.3d 151, 156 (Mo. banc 2000).

2. *Id.*

3. *Grattan v. Union Elec. Co.,* 151 S.W.3d 59, 64 (Mo. banc 2004).

may down a utility pole and that the vehicle's occupants and first-responders to the accident would be confronted with the risk of electrical injury. It is equally foreseeable that first-responders, when faced with downed power lines in the zone of injury, would delay attending to the victims until informed of the status of the lines. It is also foreseeable that this delayed treatment could subject the victims to further injury or death. By definition, UE had a duty to inform.

The legal file reveals that the first-responders to Ms. Hoffman's accident stood at bay between 35 and 47 minutes of their arrival, waiting for UE personnel to attend to a dead power line. UE knew the line was not conducting electricity two minutes prior to the arrival of the first-responders. UE knew that the line could be re-energized under certain circumstances, extremely rare circumstances by their own admission.[4] UE elected to retain the information it exclusively possessed rendering the first-responders powerless to make an informed decision on intervening.

Between the parties' pleadings there remained a total of 17 material facts in dispute in relation to Ms. Hoffman's claim. Of particular importance was testimony from one of the paramedics who stated he would have extricated Tiffany from the vehicle and provided medical treatment had UE shared its information. In the presence of a recognized duty to inform, these disputed material facts supporting a theory of unnecessary delay in treatment would allow the plaintiff to survive summary judgment. The burden on UE to provide this information is small and if a human life can be saved, the societal benefit is great. There certainly is no greater societal interest worthy of protection other than the preservation of human life.

Even if the utility company could expedite life-sustaining treatment by providing this information in but one out of one hundred accidents, given that the benefit is preserving human life, it seems unconscionable not to recognize such a simple duty to disclose this information. Recognizing the existence of this duty does not open the floodgates to frivolous litigation. A plaintiff in any case is still required to meet the significant legal burdens of proving the duty was breached, that specific injury resulted and that the breach of the duty directly and proximately caused those defined injuries.

The principal opinion responds by stressing that regulations and industry standards serve as legal recognition of the interest of preserving human life, and if UE disclosed the line status information that would somehow put more lives at risk. Contrary to the principal opinion's conclusions, recognizing this duty does not place any additional duties on the first-responders or require UE, or any other utility, to place any additional people at risk. The duty to inform is simply that, a duty to inform. The first-responders once armed with line status information can make an informed decision on whether to intervene. It is the sharing of the line status information, knowing if the line is safe to approach or not, that protects other individuals from harm. It is the concealment of this information that puts additional people at risk.

Ironically, the UE employee dispatched to the accident scene disregarded the policies, standards and regulations the principal opinion touts, and used a fiberglass pole obtained from the first-responders to move the downed line from the vehicle. At deposition, this employee stated that the line was de-energized and that he

---

4. UE admitted it would require a second car accident at the same location, a lightning strike, or the activation of an unknown backup generator for the line to re-energize.

doubted anyone would have been injured had they touched the vehicle. Apparently, this UE employee was confident that the first-responder's equipment was all that was necessary to remove the line from the vehicle.

Today, the majority opinion holds that utility companies have no legal duty to provide line status information to first-responders during a time of life-threatening emergency. While the majority may have discharged UE from any legal obligation, perhaps the company will recognize its own moral obligation to protect the sanctity of human life. It must have been difficult for the first-responders to watch the life slowly drain from Tiffany Hoffman not knowing if they made a reasoned decision to withhold treatment. I would reverse the trial court's order granting summary judgement.