

# SUPREME COURT OF MISSOURI
## en banc

STEVEN HARNER, ) *Opinion issued December 19, 2023*
)
Respondent, )
)
v. ) No. SC100030
)
MERCY HOSPITAL JOPLIN, )
)
Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF NEWTON COUNTY
The Honorable John R. LePage, Judge

### Introduction

Mercy Hospital Joplin appeals the circuit court's judgment after a jury verdict for Steven Harner on his negligence claim alleging Mercy breached its duty to protect him from the criminal acts of a third person on Mercy property. Mercy asserts the circuit court erred in overruling its motion for judgment notwithstanding the verdict because Harner failed to make a submissible case on his negligence claim under the known third person exception to the general rule that businesses have no duty to protect invitees from the criminal acts of third parties. This Court has jurisdiction, Mo. Const. art. V, sec. 10, and holds Harner failed to make a submissible case because Mercy owed no duty to Harner

under the known third person exception.[1] The circuit court's judgment is reversed, and the case is remanded.

## Background

At approximately 6:55 p.m. December 23, 2015, Kaylea Liska arrived at Mercy via ambulance with her boyfriend, who was to receive treatment at the hospital. After waiting for her boyfriend inside the hospital for some time, Liska became anxious and wanted to leave. Around 8 p.m., Liska left the hospital and entered the parking lot.

In the parking lot, Liska approached Floyd Bennett, a 79-year-old man waiting in his car, and asked him for a ride. Bennett declined, and Liska walked away but remained in the parking lot. Bennett did not report the incident to Mercy because he believed Liska was more of an annoyance than a threat.

At 8:04 p.m., Liska entered an unlocked vehicle belonging to Keith and Elnora Wooldridge. The Wooldridges were inside the hospital at the time. About 20 minutes later, the Wooldridges returned to the parking lot and found Liska inside their vehicle. Keith Wooldridge opened the door and said, "Lady, I think you're in the wrong car." Without speaking to the Wooldridges, Liska swiftly exited the vehicle and ran away, taking a case of medication from the vehicle with her.[2]

---

[1] Mercy raises two other points, both asserting circuit court error in overruling its motion for a new trial because of instructional error. Because Mercy's point regarding its motion for judgment notwithstanding the verdict is dispositive and requires reversal, this Court does not address Mercy's remaining points regarding the jury instructions.

[2] The case contained Elnora Wooldridge's prescription medications. Liska later testified she took the medications intending to sell them.

The Wooldridges immediately went back inside the hospital and reported to Mercy employee Dee-Dee Baker at the front desk that someone had been in their car and they had been robbed. Baker called Mercy employee Jody Berry, who worked in dispatch for Mercy's security department (Mercy security). Dispatcher Berry called Officer Ryan Meier with Mercy security and reported the incident to the Joplin police department.

Officer Meier arrived at the front desk shortly thereafter and spoke with the Wooldridges for approximately 20 minutes. Although the Wooldridges told Officer Meier they had been robbed, Officer Meier testified that what they described to him was a theft. The Wooldridges did not report that Liska had yelled at, threatened, or made any physical contact with them, or that she had a weapon. Officer Meier further testified that nothing the Wooldridges told him suggested Liska posed a threat to anyone at Mercy.

At 8:48 p.m., Officer Justin Larcombe with Mercy security conducted two rounds by vehicle of the Mercy parking lot to look for suspicious people entering vehicles after being advised of the Wooldridge report. At 8:54 p.m., Officer Meier went back into the parking lot with Keith Wooldridge to inspect the Wooldridges' vehicle. After his last round, Officer Larcombe stopped at the Wooldridges' vehicle to inspect it and discuss the incident with Officer Meier and Keith Wooldridge. Officer Larcombe left the scene at 9:01 p.m., parked the security vehicle, and entered the hospital. Officer Meier returned to the hospital with Keith Wooldridge at 9:04 p.m., then left to patrol the parking lot at 9:13 p.m.

Meanwhile, Liska remained in the parking lot after leaving the Wooldridges' vehicle and returned to Bennett's vehicle. Liska tapped on Bennett's window to ask for a

3

ride, and he again declined. Liska walked back into the parking lot. Like in the first occurrence, Bennett did not report the incident to Mercy.

Liska walked around the parking lot until she found another unlocked vehicle, this one belonging to Harner. Harner testified the driver side door of his vehicle did not lock, but the vehicle's alarm would sound and flash once armed if someone opened the door. Harner further testified that, before going into the hospital, he left his Ruger .380 pistol – which was loaded and had no safety – in either the center console or the glovebox, neither of which were locked.[3] Harner activated the car alarm before going into the hospital earlier that evening.

Liska entered Harner's vehicle at 8:27 p.m. (while the Wooldridges were inside talking to Baker at the front desk) and set off the car alarm. The alarm lasted for approximately 55 seconds. Liska set off the alarm again about four minutes later, this time causing the alarm to go off for approximately 12 seconds. Despite the alarms, Liska remained in the vehicle until Harner returned at 9:18 p.m. When Harner returned, he opened the door and yelled at Liska to get out of his vehicle. A brief struggle ensued, and Liska grabbed Harner's pistol, shot him in the neck, and ran off. Harner survived, though the bullet injured his carotid artery and struck his spine.[4]

---

[3] Harner testified he had a concealed carry permit and alleged he left the pistol in his vehicle to comply with Missouri law. *See* § 571.107.1(17), RSMo 2016 (prohibiting the removal of a firearm from a vehicle when on the premises of any hospital accessible by the public).

[4] Liska was arrested the next day and eventually pleaded guilty to the shooting. She was sentenced to 20 years imprisonment.

4

Harner filed a negligence action against Mercy, alleging Mercy breached its duty under the known third person exception to protect him from Liska's criminal acts while on Mercy's property. Harner alleged Officer Meier told Dispatcher Berry to review surveillance footage after the Wooldridge report, but she failed to do so. The surveillance footage captured Liska exiting the Wooldridges' vehicle and entering Harner's vehicle. At trial, Dispatcher Berry acknowledged she could have observed these events before Harner was shot had she reviewed the footage when instructed to do so.

The jury returned a verdict for Harner and found $2 million in damages. The jury assessed 75 percent fault to Mercy and 25 percent fault to Harner. Accordingly, the jury awarded Harner $1.5 million in damages against Mercy. The circuit court entered judgment in accordance with the jury verdict. Mercy filed a motion for judgment notwithstanding the verdict[5] or, in the alternative, a new trial, which the court overruled after argument. Mercy appealed and, after opinion by the court of appeals, this Court transferred the case pursuant to article V, section 10 of the Missouri Constitution.

---

[5] Mercy previously moved for directed verdict at the close of evidence on the same ground as that raised in his motion for judgment notwithstanding the verdict.

## Analysis

In reviewing a circuit court's decision on a motion for judgment notwithstanding the verdict, this Court determines whether the plaintiff made a submissible case by offering evidence to support every element necessary for liability. *Brock v. Dunne*, 637 S.W.3d 22, 26 (Mo. banc 2021). "A case is submissible when each element essential to liability is supported by legal and substantial evidence." *Id.* (internal quotations omitted). "Whether the plaintiff made a submissible case is a question of law this Court reviews *de novo*." *Id.* (internal quotation omitted). In conducting this review, the Court views the evidence in the light most favorable to the plaintiff and disregards evidence unfavorable to the verdict. *Id.* at 27. However, this Court will not supply missing evidence or make unreasonable, speculative, or forced inferences from the evidence presented. *Id.*

On appeal, Mercy asserts the circuit court erred in overruling its motion for judgment notwithstanding the verdict. Mercy argues Harner presented insufficient evidence that Mercy owed a duty to Harner under the known third person exception to the general rule that businesses have no duty to protect invitees from criminal acts of third persons. This Court agrees and reverses.

In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury. *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co.,* 75 S.W.3d 247, 257 (Mo. banc 2002). At issue here is the element of duty. A duty of care arises when "there is a foreseeable likelihood that particular acts or omissions will cause harm or injury." *L.A.C.*, 75 S.W.3d at 257 (quoting *Madden v. C & K Barbecue*

6

*Carryout, Inc.*, 758 S.W.2d 59, 62 (Mo. banc 1988)). Indeed, "[t]he touchstone for the creation of a duty is foreseeability." *Id.* Even so, "[w]here the existence of a duty is established, [] it is not one to protect against every possible injury which might occur." *Id.* "Rather, it is generally measured by whether or not a reasonably prudent person would have anticipated [the] danger and provided against it." *Id.* (internal quotation omitted).

As a general rule, businesses have no duty to protect invitees from the criminal acts of unknown third persons. *Id.* This is because such activities are rarely foreseeable. *Id.* There are limited exceptions to the general rule, however, when special facts and circumstances render injury foreseeable in a given case. *Id.* One such exception may arise when a business "knows, or has reason to know, that a third party is harming or is about to harm an entrant." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848 (Mo. banc 2018) (emphasis omitted) (internal quotation omitted). This exception is sometimes referred to as the known third person exception.

Under the known third person exception, a "duty may arise when a person, known to be violent, is present on the premises or an individual is present who has conducted himself so as to indicate danger and sufficient time exists to prevent injury." *Id.* at 849 (internal quotation omitted). This Court has explained the known third person exception "concerns when a business knows or has reason to know a specific third person is both (1) on its premises and (2) dangerous[.]" *Id.*

7

Here, neither party disputes that Mercy knew Liska was present on its premises before the shooting. Further, both parties agree Mercy's knowledge of Liska's whereabouts prior to the shooting consisted only of the Wooldridge report. The only issue here, then, is whether, based on the Wooldridge report, Mercy knew Liska was **dangerous** prior to the shooting such that a duty of care arose.

*Claybon v. Midwest Petroleum Co.*, 819 S.W.2d 742 (Mo. App. 1991), is instructive. In *Claybon*, Reginald Claybon was shot and killed by two assailants while inside a gas station applying for a job. *Id.* at 744. The plaintiffs (Claybon's beneficiaries) filed suit and alleged the owners of the gas station owed Claybon a duty of care under the known third person exception. *Id.* at 745.

The plaintiffs alleged the two assailants had been present in the gas station twice that same afternoon, before they returned for the third violent confrontation that evening that resulted in Claybon's death. *Id.* On the first occasion, they attempted to obtain cash using a credit card and were unsuccessful because such a transaction was against company policy. *Id.* On the second occasion, they received $11 worth of gasoline. *Id.* They did not have money to pay for the gasoline initially, however, so one subject remained at the station until the other returned and paid for the purchase. *Id.* When the assailants returned the third time, they sat in their car in the parking lot and observed the station's office for approximately 20 minutes. *Id.* This aroused the station's desk worker's suspicions and caused him to record the license plate number of the assailants' vehicle. *Id.* The assailants then entered the gas station, robbed it at gunpoint, and shot Claybon. *Id.* at 746.

The court of appeals concluded the gas station was under no duty under the known third person exception because the assailants had not acted "in a manner indicating they were about to become violent or dangerous." *Id.* at 746. Nothing in the record indicated that, prior to the shooting, the assailants had "displayed firearms or weapons, used loud or threatening language, or otherwise acted in a physically threatening manner." *Id.* Rather, "the assailants did not conduct themselves in a manner which indicated imminent danger until the holdup began." *Id.*

Similarly here, Liska did not act in a dangerous or threatening manner until Harner yelled at her when he found her inside his car. Prior to the shooting, there was no evidence from which Mercy could have known Liska would become violent, as she had not engaged in any verbal or physical altercations on Mercy's premises. There was no evidence Liska had or would likely use a gun prior to her use of Harner's unsecured and loaded pistol, which she found inside his unlocked vehicle.

From the Wooldridge report, Mercy merely knew Liska had, without force, entered an unlocked vehicle and fled as soon as she encountered the owners, taking prescription medications from the vehicle with her. [6] The Wooldridges did not report that Liska was

---

[6] The dissenting opinion claims Mercy knew, at minimum, Liska was committing property damage, burglary, and/or stealing. However, the dissenting opinion inflates both Liska's actual conduct and Mercy's knowledge thereof. As to property damage, the dissent highlights that Liska urinated and defecated in the Wooldridges' vehicle prior to fleeing, presumably because she was high on methamphetamine at the time. No evidence was presented, however, that Mercy knew or could have known about these facts prior to the shooting, as they were not included in the Wooldridge report. Indeed, all parties agree Mercy had no knowledge that Liska damaged property prior to the shooting. Moreover, no evidence was presented that Mercy knew Liska entered the Wooldridges' vehicle *for the purpose of committing a crime therein*, as is required for burglary. It was only *after*

armed or that she had yelled at, threatened, or made any physical contact with them. They did not describe the woman as angry, yelling, or threatening. It cannot be said these facts and circumstances render it foreseeable that Liska would become violent or dangerous.

Harner argues the Wooldridge incident plainly indicated Liska was dangerous because her act of getting into the Wooldridges' vehicle was threatening and invasive in nature. Harner posits that unlawfully entering another's vehicle and stealing prescription medication necessarily implies danger. Indeed, any crime involves some element of harm to someone or something. However, not every crime renders it reasonably foreseeable that a person is *dangerous* as contemplated by the very limited known third person exception articulated by this Court in *L.A.C.* and *Wieland*. The exception's focus on foreseeability would be lost if having knowledge of *any* previous criminal act of a known third person is sufficient to incur liability for any subsequent dangerous and criminal acts that person commits. Liska's actions prior to the shooting did not trigger the known third person exception to the general rule that businesses have no duty to protect invitees from the criminal acts of third parties.

---

Liska entered the Wooldridge vehicle that she discovered the medications and could have formed the intent to steal them. At most, Mercy had knowledge that Liska had entered the Wooldridges' vehicle without force (a trespass) and subsequently stole medications (a theft).

## Conclusion

For the reasons set forth above, Mercy had no duty to protect Harner from Liska's criminal acts on the night in question.  The circuit court's judgment is reversed, and the case is remanded.

_____
Robin Ransom, Judge

Russell, C.J., Powell, and Fischer, JJ., concur; Wilson, J., dissents in separate opinion filed; Broniec, J., concurs in opinion of Wilson, J.; Gooch, J., not participating.

11



# SUPREME COURT OF MISSOURI
## en banc

STEVEN HARNER, )
)
Respondent, )
)
v. ) No. SC100030
)
MERCY HOSPITAL JOPLIN, )
)
Appellant. )

**DISSENTING OPINION**

I would affirm the circuit court's judgment because, viewing the evidence in the light most favorable to the jury's verdict, Steven Harner made a submissible case of negligence against Mercy Hospital Joplin under the known third person exception. The principal opinion labors mightily to reach the conclusion that an individual who breaks into two vehicles on Mercy's property to steal narcotics does not pose a foreseeable risk of harm to Mercy's invitees. The evidence may permit such a conclusion, but it certainly does not compel it, and the principal opinion's holding that no reasonable person could reach an alternative conclusion cannot be justified under the applicable standard of review. Accordingly, I respectfully dissent.

**Factual and Procedural Background**

During the late afternoon/early evening of December 23, 2015, Harner learned his daughter was headed to the emergency room ("ER") at Mercy. Harner immediately left work, drove home to pick up his other daughter, and proceeded to drive to the hospital in his 2007 Jaguar convertible. Harner arrived at Mercy around 5:30 p.m. He parked his Jaguar in Mercy Parking Lot H, locked it, and proceeded to the ER. Before entering the hospital, Harner stored a Ruger LCP – a subcompact pistol he used as his concealed carry firearm – in either the center console or glovebox of the Jaguar. At the time of the incident, the Jaguar had a mechanical defect preventing the driver's side door from locking whenever Harner used his key fob to lock the vehicle. Pressing the lock button on the key fob, however, would cause the Jaguar's other doors to lock and the car alarm to arm. Additionally, the Jaguar's alarm and lights would go off in the event someone entered the driver's side door after the vehicle was locked.

At around 8:27 p.m., Kaylea Liska approached Harner's Jaguar and opened the driver's side door. The Jaguar's alarm went off, causing its lights to flash and horn to go off for approximately one minute. Four minutes later, Liska set off the Jaguar's alarm again, causing the lights to flash and horn to honk for about 12 seconds. Liska remained in Harner's vehicle for more than 50 minutes. Around 9 p.m., Harner left the ER and proceeded to his Jaguar. Harner hit the unlock button on his key fob, which caused the Jaguar's interior lights to activate and alerted him to Liska's presence in the vehicle. At around 9:18 p.m., Liska shot Harner in the neck with Harner's Ruger LCP before proceeding to flee Parking Lot H. Liska was later apprehended by law enforcement,

2

pleaded guilty to shooting Harner, and was sentenced to 20 years in the department of corrections.

Liska arrived at Mercy around 6:55 p.m. via ambulance with her boyfriend, who was seeking medical treatment. Liska ingested methamphetamine approximately four hours before arriving at Mercy. Around 8 p.m., Liska became anxious due to the methamphetamine and wandered out to Parking Lot H. At 8:04 p.m., Liska entered a white Ford Focus belonging to Keith and Elnora Wooldridge. Around 8:25 p.m., the Wooldridges walked from the ER to Parking Lot H and noticed Liska in the Focus. Liska stole a bag from the Focus containing prescription medications, exited the vehicle, and ran off. The Wooldridges testified Liska urinated and defecated in the Focus. The Wooldridges also testified Liska ate peanut butter crackers stored in the Focus. Liska testified she stole the prescription medication because she planned to sell the medication at a later date and time.

After Liska ran off, the Wooldridges returned to the Mercy ER and informed Mercy employee Dee-Dee Baker of the incident and Liska's theft of prescription medications. Baker called Mercy security dispatcher Jody Berry, who in turn called Mercy security officer Ryan Meier. At 8:34 p.m., Officer Meier arrived to the ER and spoke with the Wooldridges. Sometime between 8:39 and 8:54 p.m., Officer Meier called Berry with a description of the Wooldridges' Focus and asked her to review security footage of the incident and look for suspicious activity. Berry testified she did not attempt to review the security footage before Harner was shot, in violation of Mercy's security policies. Berry also testified that, had she viewed the security footage, it clearly

3

showed: (1) Liska entering the Wooldridges' Focus, (2) Liska exiting the Focus; (3) Liska entering Harner's Jaguar; (4) the Jaguar's alarm going off after Liska entered the vehicle; and (5) Liska remaining in the Jaguar until Harner arrived.

At around 8:30 p.m., Mercy security officer Justin Lacombe conducted a mobile round of Parking Lot H after being advised of the Wooldridges' report. At 8:48 p.m., Officer Lacombe conducted a second mobile round and stopped at the Focus to discuss the Wooldridges' report with Officer Meier and the Wooldridges. Officer Lacombe failed to drive down the row of cars where Harner's vehicle was parked during his mobile rounds, and Berry's failure to review the security footage prevented her from notifying Officer Lacombe of Liska's presence in the Jaguar.

At 8:54 p.m., Officer Meier went to Parking Lot H to inspect the Focus. Mr. Wooldridge testified that Officer Meier said Mercy security were looking for the individual later identified as Liska and that "they'd been trying to catch her." Officer Meier testified he did not attempt to talk to any potential witnesses in Parking Lot H and took no other action to ensure the individual who had been in the Focus was not still on Mercy's property. Officer Meier also testified that Mercy's policies required at least one security officer to constantly circulate through Mercy's parking lot to check for suspicious activity, and that no Mercy security officer was performing a mobile round between 8 and 8:30 p.m. Finally, Officer Meier testified that Mercy's policies required security officers to offer escorts to all hospital patrons, and that he and the other Mercy security officers failed to offer Harner an escort to his vehicle.

4

Tim Wampler, the manager of security at Mercy from 2011 to 2016, testified Berry's failure to immediately review surveillance footage of the parking lot violated of Mercy's policies. Additionally, Wampler testified Mercy security personnel should have classified the Wooldridges' report as a Priority 1 incident – i.e., a potentially "life threatening" situation – given that Liska had unlawfully entered the Wooldridges' Focus and stolen prescription medications.[1] Wampler testified Liska's actions indicated she posed life-threatening danger to Mercy's patrons because, when someone steals prescription medications, "there's a potential of anything to happen[.]" Finally, Wampler testified that, during a Priority 1 situation, Mercy security officers should have conducted an on-foot search of the parking lot to locate Liska. Mercy's retained expert stated that such a search would have taken only seven or eight minutes for a security officer to complete. On the night of the shooting, no Mercy security officer performed an on-foot search of Parking Lot H.

Harner filed a petition against Mercy for damages incurred during the December 2015 incident, alleging the hospital was negligent in failing to protect Harner from Liska. In May 2021, Mercy moved for summary judgment, arguing it had no duty to protect Harner from the criminal acts of a third party. On July 8, 2021, the circuit court overruled Mercy's motion for summary judgment. Between July 19 and July 23, a jury trial was held. Mercy moved for a directed verdict at the close of Harner's case and at the close of all evidence, and the circuit court overruled both motions. A jury returned a

---

[1]  Wampler further testified that similar dangerous situations meriting Priority 1 classification include shootings, thefts, and domestic disputes.

verdict for Harner and awarded him damages totaling $2 million, which the circuit court reduced to $1.5 million based on the jury assessing Harner 25 percent fault. On July 27, the circuit court entered judgment in accord with the jury's verdict. Mercy subsequently moved for JNOV or, in the alternative, a new trial. After further briefing and argument, the circuit court overruled Mercy's post-trial motions. Mercy timely appealed the circuit court's judgment to the court of appeals, which affirmed the circuit court's judgment. This Court then granted transfer.

## Standard of Review

"The standard for reviewing a denied motion for JNOV is essentially the same as for reviewing the denial of a motion for directed verdict." *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 652 (Mo. banc 2019) (internal quotations omitted). "A case may not be submitted unless legal and substantial evidence supports each fact essential to liability." *Id.* (internal quotations omitted). "Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case." *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010) (internal quotations omitted). "This Court views all evidence in the light most favorable to the jury's verdict and draws all reasonable inferences in the plaintiff's favor." *Tharp*, 587 S.W.3d at 652. This Court disregards all conflicting evidence and inferences and may reverse the jury's verdict "only when there is ***a complete absence of probative fact*** to support the jury's conclusion." *Id.* (emphasis added) (internal quotations omitted). "JNOV is a drastic action that can ***only be granted if reasonable persons cannot differ***

6

on the disposition of the case." *Ark.-Mo. Forest Prod., LLC v. Lerner*, 486 S.W.3d 438, 447 (Mo. App. 2016) (emphasis added).

## Analysis

"In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848 (Mo. banc 2018) (internal quotations omitted). "Whether a duty exists is purely a question of law." *Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. banc 2005). "The touchstone for the creation of a duty is foreseeability." *Id.* (internal quotations omitted). "[F]oreseeability is established when a defendant is shown to have knowledge, actual or constructive, that there is some probability of injury sufficiently serious that an ordinary person would take precautions to avoid it." *Pierce v. Platte-Clay Elec. Coop., Inc.*, 769 S.W.2d 769, 776 (Mo. banc 1989).

The relevant question of law in this case is whether a landowner can be liable to invitees for the criminal acts of a third party. This question of law is well-settled. "A duty to protect against the criminal acts of third parties is generally not recognized because such activities are rarely foreseeable." *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr., Co.*, 75 S.W.3d 247, 257 (Mo. banc 2002). However, "in situations where a special relationship exists, such as that between a business owner and invitee, and injury is foreseeable to recognizable third parties, a duty will be imposed." *Id.* Section 344, comment f, of the *Restatement (Second) of Torts* states that a possessor of land "is

7

ordinarily under no duty to exercise any care ***until he knows or has reason to know*** that the acts of the third person are occurring, or about to occur." (Emphasis added).

This Court – following section 344, comment f, of the *Restatement (Second) of Torts* – adopted two exceptions to the general rule, referred to in Missouri as the known third person exception and the unknown third person exception.[2] *Wieland*, 540 S.W.3d at 848. For a plaintiff to make a submissible case of negligence under the known third person exception, the plaintiff must present substantial evidence that the landowner: (1) knew or had reason to know of the third party's presence; (2) knew or had reason to know the third party presented a danger to its invitees; and (3) had sufficient time to protect its invitees. *L.A.C.*, 75 S.W.3d at 257; *see also Wieland*, 540 S.W.3d at 848.[3] In

---

[2] Several jurisdictions have adopted the exceptions listed in section 344, comment f. The nomenclature used to refer to the exceptions, however, and the scope of the exceptions themselves, vary greatly. *See The Law of Premises Liability* § 11.03[1], 11-7 (collecting cases adopting section 344 comment f's exceptions and the scope of the exceptions in various jurisdictions); *see also Hills v. Bridgeview Little League Ass'n*, 745 N.E.2d 1166, 1186-89 (Ill. 2000) (recognizing a general "no-duty" rule but also recognizing exceptions and noting a duty may arise for businesses to protect their invitees from third-party attacks); *Nivens v. 7-11 Hoagy's Corner*, 943 P.2d 286, 290-93 (Wash. 1997) (adopting section 344 and holding a business has a duty to protect invitees "from imminent criminal harm and reasonably foreseeable criminal conduct by third persons"); *Broadus v. Chevron USA, Inc.*, 677 So. 2d 199, 202 (Ala. 1996) (generally recognizing "special relationships" and "special circumstances" can overcome the general "no-duty" rule, but only in instances in which a business had actual or constructive knowledge of criminal activity that could endanger an invitee).

[3] While not at issue in this case (because Harner opted to submit his claims to the jury only under the known third person exception), the unknown third person exception applies when a plaintiff has shown substantial evidence "that would cause a reasonable person to anticipate danger and take precautionary actions to protect its business invitees against the criminal activities of unknown third parties." *L.A.C.*, 75 S.W.3d at 258. The plaintiff need only show "that a reasonable person could have foreseen that injuries of the type suffered would be likely to occur under the circumstances." *Id.* (internal quotations

8

all succeeding cases, including the present case, there is no question of law to be re-decided, only the question of whether the evidence is sufficient as a matter of law to support the jury's finding that the three identified facts are true. *See Hackmann v. Mo. Am. Water Co.*, 308 S.W.237, 239 (Mo. App. 2009) (noting, "[w]hile the issue of whether a duty exists is a question for the court, conclusions about the particular facts of [a] case are an issue for the jury"); *see also* W. Prosser & W. Keeton, *Prosser and Keeton on the Law of Torts*, § 37 at 236 (5th ed. 1984) (noting, "[o]nce it is determined that reasonable persons may differ as to whether a fact has been proved, the probative value of the evidence, and the conclusions to be drawn from it, lies in the hands of the jury"). There was sufficient evidence for the jury to find these elements in this case, and the principal opinion's conclusions that no reasonable person could do so is unwarranted.

First, Harner presented evidence that Mercy knew or had reason to know of Liska's presence on its premises. Harner presented evidence that Mercy security personnel were notified no later than 8:34 p.m. that Liska had unlawfully entered a patron's vehicle on its premises and stole narcotics from that vehicle. Harner also presented evidence that Mercy had security footage showing that Liska remained on Mercy's property after breaking into the Wooldridges' Focus and, eventually, broke into and remained in Harner's Jaguar.

---

omitted); *see also Restatement (Second) of Torts*, § 344 cmt. f (noting, if a business's place or character causes it to "reasonably anticipate careless or criminal conduct on the part of third persons, … [the business] may be under a duty to take precautions against it, and to provide a reasonable sufficient number or servants to afford reasonable protection").

9

Harner also presented evidence that Mercy knew or had reason to know Liska presented a danger to Mercy's invitees.[4]  Mercy was aware of the fact that Liska unlawfully entered the Wooldridges' Focus, remained there for a period of time, and then stole prescription medications from the Focus.  Mercy's head of security testified that Liska's actions should have been categorized as a Priority 1 incident – i.e., a situation potentially threatening the lives of Mercy's patrons.  In other words, Mercy's policies recognize the combined acts of breaking into a vehicle and stealing narcotics are highly dangerous and invasive criminal activities creating a clearly foreseeable risk of danger to the vehicle's owner and other patrons using the parking lot.[5]

---

[4]  The principal opinion seems to suggest that the "danger" element requires Harner to prove that Mercy knew or had reason to know of the precise mechanism of harm, i.e., that Liska find and use a gun to shoot a patron.  This is incorrect.  Harner need prove only that Mercy knew or had reason to know Liska posed a danger to its patrons.  This likelihood of danger must be foreseeable, of course, but Mercy's own policies recognized the desperation and dangerousness of people stealing prescription medications are what make such people dangerous and likely to cause harm of whatever sort if discovered.  Mercy insists Liska's gender and stature weigh against this inference, but this argument ignores the standard of review, which requires this Court to view the evidence in the light most favorable to the jury's verdict and ignore all evidence and inferences not supporting that verdict.  *Tharp*, 587 S.W.3d at 652.

[5]  Nothing in *Wieland* limits liability under the known third person exception to situations in which the third party's conduct is criminal but, when it is, the criminality of that conduct very nearly always satisfies the requirement that the landowner know or have reason to know the third party poses a danger to its patrons.  *Supra* at n.2.  Here, Mercy knew Liska was engaged in criminal conduct.  At a minimum, she was committing first-degree property damage, § 569.100, RSMo Supp. 2012, second-degree burglary, § 569.170, RSMo Supp. 2000, and/or felony stealing, § 570.030, RSMo Supp. 2013.  The General Assembly's decision to criminalize Liska's conduct, together with Mercy's own policies regarding such conduct are more than sufficient for the jury to find Mercy knew Liska posed a danger to others.

Finally, there was substantial evidence that Mercy had sufficient time to protect Harner.  Harner established that Mercy was aware of Liska's presence no later than 8:30 p.m., when the Wooldridges reported Liska's theft to Mercy representatives.  From that point on, Mercy had roughly an hour to search for Liska and secure Parking Lot H.  And had Berry viewed the security footage (as she was required to do under Mercy's security policies and a specific request from Officer Meier), the need for such a search would have been eliminated because that footage showed Liska entering and remaining in Harner's Jaguar.  Harner established that Mercy security personnel woefully failed to comply with its security policies by failing to: (1) conduct an immediate review of the security footage from Parking Lot H; (2) ask Harner if he wanted an escort when he departed the ER; (3) continuously patrol Parking Lot H in a security vehicle; and (4) conduct an on-foot search of Parking Lot H after learning of the Wooldridge incident, which would have taken seven or eight minutes to complete.  Harner also presented evidence that – had Berry followed Mercy's security policies and reviewed security footage after receiving the Wooldridges' report – Mercy would have been able to determine that Liska broke into Harner's vehicle and was still present in the vehicle at least 25 minutes before Liska shot Harner.  Mercy had more than ample time to locate Liska and protect Harner.

.

**Conclusion**

While this Court generally has not imposed a duty on businesses to protect its invitees from the criminal acts of third parties, it has recognized a duty when the criminal conduct of the third party is foreseeable. Here, there is substantial evidence to support the conclusion that Harner made a submissible case of negligence against Mercy under the known third person exception. To hold, as the principal opinion does, that there is a complete absence of probative fact to support the jury's conclusion that Mercy was negligent ignores the applicable standard of review, invades the province of the jury, and flies in the face of common sense.[6]

_____
Paul C. Wilson, Judge

---

[6] Because the principal opinion convicts the circuit court of error for not sustaining Mercy's motion for JNOV, it does not reach Mercy's allegations of instructional error. Nevertheless, the committee on civil jury instructions should consider drafting a specific MAI for cases submitted under the known third person exception. In doing so, the committee should note the pertinent language for the defendant's duty of care in a known third person exception case is "knows or has reason to know," not "should know" or "could know." *See Wieland*, 540 S.W.3d at 849; *see also* Restatement (Second) Torts, § 12 cmt. a (noting "'reason to know' implies no duty of knowledge on the part of the actor whereas 'should know' implies that the actor owes another the duty of ascertaining the fact in question").