

# In the Missouri Court of Appeals
## Eastern District
### SPECIAL DIVISION

| | | |
|---|---|---|
| SHANNON DUGAN, | ) | No. ED111485 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | the City of St. Louis |
| vs. | ) | 1822-CC00663 |
| | ) | |
| HYATT CORPORATION D/B/A | ) | Honorable Timothy J. Boyer |
| HYATT REGENCY ST. LOUIS AT THE | ) | |
| ARCH, | ) | |
| | ) | |
| Appellant. | ) | Filed: December 3, 2024 |

Before Thomas C. Clark, II, C.J., James M. Dowd, J., and Renée Hardin-Tammons, J.

### Introduction

On April 19, 2016, at the Hyatt Regency hotel in downtown St. Louis, Hyatt security guard D.W. used his master key to sneak into respondent Shannon Dugan's hotel room while she slept to sexually assault her. In her petition against Hyatt, Dugan brought claims for negligent hiring of D.W., negligent supervision of D.W., and negligent training and supervision of Hyatt security employees which she claimed led to the assault.

Hyatt now appeals the judgment entered on the jury's verdict in favor of Dugan in the amount of $28 million in compensatory damages and $149 million in punitive damages. In its four points on appeal, Hyatt alleges the trial court erred (1) in admitting evidence of D.W.'s prior arrest and investigations for sex crimes because the evidence was irrelevant and constituted hearsay; (2) because the verdict-directing instruction on Hyatt's negligent supervision of D.W. (Instruction No. 10) did not contain the ultimate facts required to find Hyatt liable for negligent

supervision, namely that D.W. was acting outside the scope of his employment and that Hyatt had the ability and should have foreseen the need to supervise him; (3) because the verdict-directing instruction (Instruction No. 14) on Dugan's claim that Hyatt negligently supervised its security employees, *other than D.W.*, was defective for the same reasons claimed in point two regarding Instruction No. 10; and (4) in denying Hyatt's motions for a directed verdict and for JNOV on punitive damages because there was not sufficient evidence to support the submission of punitive damages to the jury.

With respect to point one, we find that Hyatt's claim on appeal is not preserved for our review because Hyatt's continuing objection, that any reference to D.W.'s criminal history would be "improper," is not the same as and did not preserve the grounds Hyatt now raises on appeal – that such evidence was irrelevant and was hearsay. Regardless, the evidence of D.W.'s criminal history, which included an arrest for deviate sexual assault and sodomy and three other police investigations for sex-related offenses, is logically and legally relevant and is not hearsay because D.W. testified that the arrest and investigations had occurred and Hyatt testified that if it had known that information, it would not have hired D.W.

As for Hyatt's claims in points two and three, that the verdict directors for Dugan's negligent supervision claims erroneously failed to include certain required ultimate facts, we disagree and hold that both instructions correctly omitted the undisputed matters that D.W. was acting outside the scope of his employment when he assaulted Dugan and that Hyatt foresaw or should have foreseen the need to supervise him. Since those two matters are part of the trial court's *legal* determination that Hyatt had the duty to supervise D.W. and the other security guards, a determination Hyatt has not challenged here on appeal, they were not required to be included in the verdict directors on Dugan's negligent supervision claims.

2

Finally, with respect to Hyatt's argument in point four that the court should not have submitted the punitive damages claim, the record of Hyatt's pre-assault failures to enforce its own policies, repeatedly admitted by Hyatt, together with Hyatt's post-assault resistance, interference, and failure to cooperate with the police investigation of this criminal sexual assault, again, in violation of its own policies, fully supports the trial court's submission of the punitive damages claim here.

## Background

### The Assault

Dugan, a sheriff's deputy from New Jersey, traveled to St. Louis with a co-worker on April 17, 2016, to attend a seminar on death investigations. On April 18, 2016, Dugan and Co-worker attended classes from 8:30 a.m. to 5:00 p.m. and then went to a Cardinals' baseball game. After the game but before returning to the Hyatt, they went to a brewery in Ballpark Village, a dining area near the stadium. Upon their return to the hotel around 11:00 p.m., Dugan went to her room on the ninth floor, showered, and went to bed. Later, when Co-worker was unable to locate his cell phone, he speculated that Dugan might have it and since his hotel room was near hers, he called Dugan's cell phone and then knocked on her door but got no response. Co-worker became concerned for Dugan, so he called Hyatt security at around 11:30 p.m. and requested they conduct a wellness check.

When Co-worker placed this call to Hyatt security, D.W., another security guard (Guard), and their supervisor (Supervisor) were on duty for the 11:00 p.m. to 7:30 a.m. shift in the security room on the ground floor of the hotel. D.W. volunteered to do the wellness check and when Guard stated she wanted to go outside to smoke, D.W. went alone to Dugan's room. Hyatt's wellness check policy required that two security guards perform all wellness checks.

3

D.W., accompanied by Co-worker, knocked on Dugan's door but she did not respond. When D.W.'s attempt to open the door with his master key was thwarted by the interior night latch, he requested assistance from the hotel's engineering personnel to disengage the night latch, which they successfully did, and then D.W. entered the room alone while Co-worker waited in the hallway. Inside, D.W. claimed he tried to wake Dugan, but that she did not rouse. D.W. then left the room with the night latch disengaged. Later, D.W. told Guard that Dugan was "gurgling" when he tried to wake her. Neither summoned medical assistance.

At 12:51 a.m., D.W. left his security post and, unbeknownst to Supervisor and Guard, returned alone to Dugan's room and used his master key to enter the room where he sexually assaulted Dugan while she slept. When Dugan awoke with D.W. on top of her with his hands between her legs, D.W. quickly fled before Dugan realized fully what had happened. D.W. ran out of the room and took the steps down one floor where security cameras captured him boarding the eighth-floor elevator to return to the security room.

Dugan, startled and bewildered in a semi-awake state, sent herself a text message to record the time of the assault. She eventually fell back to sleep. When she awoke in the morning, she called the front desk and asked whether someone had been in her room around 1:30 a.m. The front desk told her that someone had been in her room to do a wellness check and then transferred her call to D.W. himself who confirmed that he had done the 11:30 p.m. wellness check. He did not tell her that he returned later to sexually assault her.

Later that morning, Dugan, in person, sought a copy of the lock interrogation record that would have confirmed whether and when a key had been used to unlock her door. When she asked Hyatt's security director (Security Director) for a copy of this record or to allow her to take a photograph of it to share with the police, he refused and told her she would need to get a subpoena.

4

Hyatt's written policy mandates Hyatt personnel assist victims of crimes occurring on hotel property by "reporting the incident to the police or other appropriate government agency." Hyatt did not contact the police. Dugan and Co-worker went to the nearest St. Louis Police Department precinct and were directed to the special victims unit on Olive Street.

Around 11:30 a.m. that morning, detectives from the special victims unit arrived at the hotel. Hyatt confirmed to them that a hotel security camera captured an individual, later identified as D.W., entering Dugan's room around 1:30 a.m. By this time, Hyatt had already started its own investigation of the assault by securing the relevant video surveillance and the lock interrogation record. Hyatt declined to share those materials with the detectives as Security Director told them he needed approval from Hyatt's risk management department. Detectives phoned Hyatt's risk management office and spoke with Hyatt's vice president and general counsel who confirmed that Hyatt would not release the requested materials to police without a subpoena. The detectives then requested that Hyatt not communicate with D.W. until police had located him and interviewed him. Hyatt did not inform the police when on April 20, the day after the assault, D.W. called Hyatt's human resources director and said he was leaving town.

*D.W.'s Employment by Hyatt*

In 2015, D.W. applied for a security guard position at the Hyatt. Hyatt contracted with HireRight, LLC to perform a background check on D.W. and requested that HireRight search for criminal convictions occurring in the previous seven years. HireRight found no criminal convictions on D.W.'s record during the preceding seven years. Hyatt's written policy required a search for all criminal history of a job applicant.

Security Director interviewed D.W. for a few minutes in the hotel lobby before hiring him. Hyatt did not verify the references or prior employment D.W. listed on his employment

5

application. After he was hired, D.W. passed an FBI background check in order to obtain a security license.

Hyatt's background search did not uncover (1) that police investigated D.W. in 2001 for masturbating in public in plain view of a woman; (2) that police investigated D.W. in 2003 for making sexually harassing phone calls to a thirteen-year-old girl; (3) that police arrested and charged D.W. in 2005 with deviate sexual assault and sodomy; (4) that police investigated D.W. in 2005 for sexual abuse and harassing phone calls to a mentally disabled woman; and (5) that D.W. included a fabricated prior job on his application.

*D.W.'s Deposition Testimony*

During its direct examination of D.W. at his deposition, Hyatt elicited D.W.'s testimony in which he confirmed that he was arrested in 2005 for deviate sexual assault and sodomy and was investigated by law enforcement for three other instances of sexually-related misconduct including masturbating in direct view of a woman and for making sexually harassing and suggestive phone calls to a thirteen-year-old girl and to a mentally disabled woman. D.W. denied that he had engaged in any of that conduct. Hyatt designated for use at trial the foregoing testimony including D.W.'s denials. Dugan played this testimony to the jury in its case-in-chief.

*Trial*

i. *D.W.'s criminal history.*

At a brief pre-trial conference on the morning of the first day of trial, Hyatt broached the subject of its opposition to the admission of the evidence of D.W.'s criminal history which it had previously raised in a motion *in limine*. Hyatt argued to the court that "any reference to [D.W.'s] criminal history or investigations" would be "improper." The court granted Hyatt a continuing objection on that basis to any such reference.

6

Dugan's liability expert (Expert), a criminologist, testified at her deposition and at trial that on the basis of D.W.'s criminal arrest and criminal investigation history, D.W. had dangerous proclivities and the sexual assault of Dugan was foreseeable. Expert testified generally that sexual offenders have a high recidivism rate compared to other offenders and that given his history, D.W. was a "classic kind of an opportunistic predator."

Hyatt's human resources manager, called as an adverse witness pursuant to section 491.030[1] during Dugan's case-in-chief, admitted on direct examination that Hyatt would not hire and would not give a master key to all guest rooms to someone who (1) had an arrest record related to sexual abuse/assault, (2) may be considered a sexual predator, (3) had a history of sexually lewd acts, or (4) had done any of the four investigated offenses in D.W.'s criminal history. Hyatt did not object to this testimony on relevance or hearsay grounds or on any grounds at all.

*ii.     Security Director testified as Hyatt's corporate representative.*

Hyatt's Security Director, also called by Dugan as an adverse witness, testified as Hyatt's corporate representative and admitted on direct examination (1) that Hyatt's policy called for two security officers to perform all wellness checks, (2) that Supervisor, Guard, and D.W. should have been, but were not, trained to follow this policy, and (3) that Supervisor dispatched only D.W. to Dugan's room on the night of the assault. Further, Security Director admitted that Hyatt "has to make sure [security guards are] supervised properly to make sure they don't do anything to endanger the safety of guests." Lastly, Security Director admitted that "due to the many breaches of Hyatt's policies, Shannon Dugan was sexually assaulted in her room."

---

[1] All statutory references are to the Revised Statutes of Missouri (2016).

*iii.* *Jury Instructions.*

Instruction 10, the verdict director on Dugan's claim against Hyatt for its negligent supervision of D.W., stated:

In your verdict, you must find in favor of plaintiff Shannon Dugan, if you believe:

First, Hyatt Corporation failed to adequately supervise Hyatt Security Officer [D.W.] in one or more of the following respects,

> to require that they have at least two employees involved in the wellness check of Shannon Dugan, or

> to require that after the wellness check of Shannon Dugan her room was secured with a security latch, or

> to require that they always awaken or rouse the guest, or if the guest cannot be awakened, call for medical assistance, and

Second, Hyatt Security Officer [D.W.] did not do one or more such things, and

Third, such failure by Hyatt corporation was negligent, and

Fourth, such failure directly caused or directly contributed to cause damages to Plaintiff Shannon Dugan.

Instruction 14, virtually identical to Instruction 10, posited Hyatt's negligent supervision vis-à-vis the other security personnel involved, namely Guard, Supervisor, and Security Director and provided:

In your verdict, you must find in favor of plaintiff Shannon Dugan, if you believe:

First, Hyatt corporation failed to adequately supervise its employees other than Hyatt Security Officer [D.W.] in one or more of the following respects,

> to require they have at least two persons involved in the wellness check of Shannon Dugan, or

> to require that after the wellness check of Shannon Dugan her room was secured with a security latch, or

> to require that they always awaken or rouse the guest or, if the guest cannot be awakened, call for medical assistance, and

Second, the other employees did not do one or more of such things, and

8

Third, such failure by Hyatt was negligent, and

Fourth, such failure directly caused or directly contributed to cause damage to plaintiff Shannon Dugan.

In addition, Instruction No. 6 defined "'negligent' or 'negligence' as used in these instructions means the failure to use that degree of care that an ordinarily careful person would use under the same or similar circumstances."

Hyatt objected to Instructions 10 and 14 as incorrect statements of the law because they did not include (1) that D.W. or the other employees were acting outside the scope of their employment and (2) that D.W.'s conduct was foreseeable. The court overruled the objections. Hyatt did not propose its own verdict directors.

*Damages*

Dugan testified about the assault and its impact on her life. Her mother, a close friend, and a co-worker testified to their observations of Dugan before and after the assault. Dugan's treating psychologist diagnosed Dugan with moderate to severe Post-Traumatic Stress Disorder caused by the assault. Her symptoms include trigger avoidance, nightmares, flashbacks, and gastrointestinal symptoms. She has a "persistent negative emotional state of fear, horror, anger, guilt, or shame." She no longer stays by herself in hotel rooms. Dugan's co-worker testified the assault turned Dugan from a brave, strong, and outgoing person to someone who is withdrawn, sad, and untrusting.

**Discussion**

*Point One*

In point I, Hyatt alleges the trial court committed reversible error by admitting into evidence D.W.'s past criminal investigations and his prior arrest for sexual misconduct because that evidence was irrelevant and was hearsay. Hyatt's continuing objection to that evidence –

9

and its only objection at trial – was that any reference to those matters would be "improper." We find this objection inadequate to preserve the claims Hyatt now makes here on appeal. *State v. Amick*, 462 S.W.3d 413, 415 (Mo. banc 2015) ("To preserve a claim of error, counsel must object with sufficient specificity to apprise the trial court of the grounds for the objection.").

Nevertheless, laying aside Hyatt's preservation obstacle, the evidence of D.W.'s criminal history was relevant and was not hearsay. Hyatt's own policies, Hyatt's representatives' testimony, Dugan's expert's testimony, and Missouri law on negligent hiring claims all establish overwhelmingly the relevance of D.W.'s criminal history. As for hearsay, D.W.'s deposition testimony, in which he acknowledged that the investigations and the arrest occurred, meant that his criminal history was, by definition, not hearsay.

*A.*

First, preservation. An appellant "must stick with the theory of their trial court objection and may not present here some different reason that testimony should have been excluded." *Firestone v. Crown Ctr. Redev. Corp.*, 693 S.W.2d 99, 107 (Mo. banc 1985). "The objection must be specific and made contemporaneously with the purported error." *State v. Driskill*, 459 S.W.3d 412, 425-26 (Mo. banc 2015). "[T]he objection must call the court's attention to the ground or reason for the objection." *State v. Rogers*, 973 S.W.2d 495, 498 (Mo. App. S.D. 1998) (citing *State v. Lang*, 515 S.W.2d 507, 511 (Mo. 1974)). "By presenting a specific objection, a party ensures the circuit court is apprised of the rationale for the objection and may make an informed ruling." *Rhoden v. Missouri Delta Medical Center*, 621 S.W.3d 469, 484 (Mo. banc 2021).

"While a continuing objection may seem to be an effective tool at trial, there are trade-offs that may impact an appeal." *State v. Minor*, 648 S.W.3d 721, 734 (Mo. banc 2022). "Continuing objections based upon considerable pretrial hearings may not convey a party's exact

10

concerns at the time testimony is offered." *Id.* Nevertheless, the scope of a continuing objection is limited to the basis upon which it was granted. *Slankard v. Thomas*, 912 S.W.2d 619, 628 (Mo. App. S.D. 1995) (citation omitted).

In this case, Hyatt is faced with the hazard regarding continuing objections identified in the foregoing paragraph. The context of Hyatt's continuing objection here is as follows: In a pretrial motion *in limine,* Hyatt challenged Dugan's expert's reliance on the evidence of D.W.'s criminal history. Hyatt's claim was that Expert had no expertise in employment hiring issues or human resources such that she was not qualified to opine in reliance on D.W.'s criminal history regarding the sufficiency of Hyatt's hiring process, in particular regarding HireRight's background check's failure to reveal D.W.'s criminal history.

But, critically, in its motion Hyatt conceded that Expert was qualified regarding the *foreseeability* of D.W. committing a sex-related crime: "[Expert's] applicable field of expertise related to this case is limited to opinions regarding whether or not it was foreseeable that [D.W.] would have committed a crime." Hyatt did not raise any relevance or hearsay objection to Expert's reliance on D.W.'s criminal history.

So, with that background, we turn to the brief pre-trial conference that took place on the day trial started. Hyatt asked the court to permit it to have a "continuing objection" that D.W.'s criminal history evidence would be "improper." Hyatt did not object at that time or at any time during trial that the evidence of D.W.'s criminal history was hearsay or irrelevant.

The question becomes then whether Hyatt's objection to the evidence as being "improper" may be deemed specific enough to encompass either or both of these objections that Hyatt now seeks to raise on appeal. We find that it does not. "Improper" in no way puts the trial court on notice that the objected-to evidence is irrelevant or constitutes hearsay. *See Amick,* 462 S.W.3d at 415. In any trial, every objection to the admission of proffered evidence in some way

11

avers that the evidence is improper. But Missouri law requires more. It requires the party to tell the court *how* it is improper. *Rogers*, 973 S.W.2d at 498. Deeming Hyatt's "improper" continuing objection to be sufficiently specific to preserve its relevance and hearsay objections it now seeks to raise here conflicts with Missouri's longstanding objection-specificity requirement because it would allow Hyatt to allege the evidence was "improper" and then, for the first time on appeal, search the record for the specific legal basis of their objection. *See Slankard*, 912 S.W.2d at 628. Point denied.

### B.

Nevertheless, were we to get to the merits of Hyatt's argument, we would still affirm the trial court's decision to admit this evidence under the broad discretion enjoyed by trial courts on evidentiary issues because Hyatt's relevance and hearsay arguments lack merit.

### *The evidence is relevant to Dugan's negligent hiring claim*

Evidence must be both "logically and legally relevant to be admissible." *McGaughy v. Laclede Gas Co.*, 604 S.W.3d 730, 758 (Mo. App. E.D. 2020). "Evidence is logically relevant if it tends to make the existence of any consequential fact more or less probable, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." *Id.* "Evidence is legally relevant if its probative value outweighs any prejudicial effect on the jury." *Id.*

The crux of Dugan's negligent hiring claim is that Hyatt should have known of D.W.'s dangerous proclivities and that Hyatt's negligence was the proximate cause of her injuries. *See Gibson v. Brewer*, 952 S.W.2d 239, 246 (Mo. banc 1997). Dangerous proclivities are demonstrated in negligent hiring cases through *prior misconduct*. *McHaffie By and Through McHaffie v. Bunch*, 891 S.W.2d 822, 825 (Mo. banc 1995) (emphasis added).

12

The record before us readily establishes that the evidence of D.W.'s criminal history was relevant and that the trial court did not abuse its discretion in admitting this evidence. In fact, Hyatt's own policies and the extensive and on-point testimony of Hyatt's own representatives satisfy the legal and logical relevance requirements for this evidence. Hyatt's policy stated that background investigations should check for "criminal history" including "verification to include past history, where available." Further that "criminal history ... would be sufficient to warrant excluding such persons from Security employment with Hyatt." But here, Hyatt restricted the scope of HireRight's investigation to "convictions" as opposed to its policy's broader "criminal history" and then only those convictions occurring during the prior seven years.

And while Hyatt now claims that D.W.'s criminal history was too remote in time, Hyatt's policies draw no such temporal line, instead they call for the complete criminal history of security guard applicants. Though Hyatt makes much here of the fact that none of D.W.'s sex-related criminal history resulted in a conviction, Hyatt's own policy shreds that argument as did the testimony of its human resources director who admitted that Hyatt would not want to hire someone with an *arrest* record related to sexual abuse. In short, evidence of prior misconduct in a negligent hiring case is not limited to prior convictions and such evidence here was relevant. *Bunch*, 891 S.W.2d at 825.

*The evidence of D.W.'s criminal history was not hearsay*

The evidence of D.W.'s criminal history came into this record through the deposition of D.W. himself and was adduced by Hyatt itself. While D.W. claimed to be innocent of all of those instances, he admitted that those investigations and the arrest occurred. By definition, that testimony is not hearsay.

"Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted." *Viacom Outdoor, Inc. v. Taouil*, 254 S.W.3d 234, 238 (Mo. App. E.D. 2008) (citation

13

omitted).  Deposition testimony is not an "out-of-court" statement because "[a]ny part of a deposition that is admissible under the rules of evidence applied as though the deponent were testifying in court may be used against any party who was present or represented at the taking of the deposition or who had proper notice thereof."  Rule 57.07(a).  Further, "depositions may be used in court for any purpose."  *Id.*

Thus, D.W.'s deposition testimony in which he confirmed his criminal history involving sexual misconduct is not hearsay.  *Viacom Outdoor*, 254 S.W.3d at 238; Rule 57.07(a).  Though he denied doing any of that sexual misconduct, the truth of the matter asserted was not that he did those crimes but that those investigations and that arrest had occurred and could have been discovered by Hyatt if it had adequately investigated his complete criminal history as opposed to just his conviction history for the preceding seven years.

*Dugan's Expert's reliance on D.W.'s criminal history*

Further, we see no issue with regard to Expert's reliance on D.W.'s deposition testimony that was provided to Expert because, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Section 490.065(2).

Here, Expert's opinion at trial, that the assault was foreseeable, properly drew from D.W.'s admissible testimony.  Dugan did not attempt to introduce any records or other documentation of D.W.'s past criminal conduct and Expert did not discuss the contents of any records, including police reports, that she may have reviewed in forming her opinion.[2]  The only

---

[2] Nevertheless, Expert could likely have properly relied on police reports as well.  In *Peterson v. National Carriers, Inc.*, 972 S.W.2d 349, 354 (Mo. App. W.D. 1998), the court noted that Missouri courts have routinely found that police reports "can be relied upon by expert witnesses in giving their opinions," even though they would otherwise constitute inadmissible hearsay.  *Id.* at 355.  So long as the hearsay evidence is used as support for

14

criminal incidents she discussed in any detail were the ones to which D.W. admitted in his deposition which was played at trial. And Expert acknowledged D.W.'s denial that the events being investigated had occurred.

Critically, Hyatt did not object to any of Expert's testimony at trial. Instead, Hyatt chose to attack the credibility of Expert's use of D.W.'s criminal history through cross-examination during which Expert agreed with Hyatt that a criminal investigation does not mean a crime had been committed and an arrest does not mean criminal conduct had been done. And because the jury "is the sole judge of the credibility of witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony," this jury was free to believe or disbelieve Expert's use of this relevant, non-hearsay evidence. *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 105 (Mo. banc 2010). Point one is denied.

*Points Two and Three*

In points two and three, Hyatt claims the trial court erred by giving Instruction 10, negligent supervision of D.W., and Instruction 14, negligent supervision of security employees *other than D.W.*, because both verdict directors did not hypothesize certain facts, which Hyatt now claims were disputed ultimate facts, in order to find Hyatt liable on those claims. Specifically, Hyatt alleges the verdict directors should have required the jury to determine (1) whether D.W. and the other security guards were acting outside the scope of their employment,[3]

_____

the expert's opinion and is not offered as independent evidence, it should not be excluded. *Id.* at 354.

[3] We agree with Dugan's argument in her brief that whether the other security guards acted outside the scope of their employment is not at issue in this case. The conduct of the other employees that is at issue is how their negligence allowed D.W. to act outside the scope of his employment when he committed the sexual assault on Dugan.

15

and (2) whether Hyatt knew or should have known of the need and opportunity to control D.W. as he acted outside the scope.

We disagree because those two questions, apart from being undisputed and repeatedly conceded by Hyatt at trial, are not jury questions in the context of this case but rather are part of the trial court's duty determination which under Missouri law is a legal question entrusted to the trial court, not to the jury. Moreover, Hyatt has not challenged on appeal the trial court's duty finding and, in fact, admitted to it at trial.[4]

*A. Standard of Review*

Typically, "[w]hether a jury was properly instructed is a question of law this Court reviews *de novo*." *Holmes v. Kansas City Public School District*, 571 S.W.3d 602, 614 (Mo. App. W.D. 2018). "When reviewing a claimed instructional error, we view the evidence most favorably to the instruction and disregard contrary evidence." *Douglas v. St. Louis Cold Drawn, Inc.*, 439 S.W.3d 775, 779 (Mo. App. E.D. 2014). "We will reverse the verdict 'only if the party claiming instructional error establishes that the instructions at issue misdirected, misled, or confused the jury, resulting in prejudicial error.'" *Id.* (quoting *Howard v. City of Kansas City*, 332 S.W.3d 772, 790 (Mo. banc 2011)).

In Missouri, the claim of negligent supervision is not graced with an MAI-approved instruction and "a not-in-MAI instruction must 'follow[] substantive law by submitting the ultimate facts necessary to sustain a verdict.'" *Johnson v. Auto Handling Corp.*, 523 S.W.3d

---

[4] Q. You have to make sure they're supervised properly. Hyatt has to make sure they're surprised [sic-should be supervised] properly to make sure they don't do anything to endanger the safety of a guest?
A. Correct.
Q. Because at Hyatt, Hyatt needs to take every step to take care of their guests and make sure they're safe and they are not harmed while on the premises; correct?
A. Correct.

452, 463 (Mo. banc 2017) (quoting *Seitz v. Lemay Bank & Trust*, 959 S.W.2d 458, 462 (Mo. banc 1998)). "A proper instruction submits only the ultimate facts, not evidentiary details, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another." *Id.* (citation omitted). "This means the theory submitted must be one recognized under Missouri law and the ultimate facts necessary for recovery under that theory must be included in the instruction." *Id.*

"Which facts are ultimate facts must be determined on a case by case basis, and depends on the specific theory of negligence presented by the plaintiff." *Boggs ex rel. Boggs v. Lay*, 164 S.W.3d 4, 20 (Mo. App. E.D. 2005). "It is not necessary that a verdict directing instruction require the jury to find an element of the case which is not at issue and conceded by the parties." *Siedler v. Tamar Realty Co.*, 491 S.W.2d 566, 570 (Mo. App. 1973). *See also Cline v. Carthage Crushed Limestone Co.*, 504 S.W.2d 102, 112 (Mo. 1973) ("When agency is not a contested issue a verdict-directing instruction need not contain a requirement of a finding of agency.").

"A 'roving commission' occurs when an instruction assumes a disputed fact or submits an abstract legal question that allows the jury 'to roam freely through the evidence and choose any facts which suit[] its fancy or its perception of logic[] to impose liability.'" *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 481 (Mo. banc 2005).

*B. The duty element for an innkeeper in a claim of negligent supervision*

"Concepts of duty and foreseeability have not always been clearly stated in Missouri law." *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 155 (Mo. banc 2000). "In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848 (Mo. banc 2018) (internal quotations omitted). "Whether a duty exists is purely a question of law." *Hoffman v.*

17

*Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. banc 2005). *Id.* "The touchstone for the creation of a duty is foreseeability." *Id.* (internal quotations omitted). "[F]oreseeability is established when a defendant is shown to have knowledge, actual or constructive, that there is some probability of injury sufficiently serious that an ordinary person would take precautions to avoid it." *Pierce v. Platte-Clay Elec. Coop., Inc.*, 769 S.W.2d 769, 776 (Mo. banc 1989).

As Judge Wilson wrote in *Coomer v. Kansas City Royals Baseball Corp.*, 437 S.W.3d 184, 200 (Mo. banc 2014), "[T]he reason courts—not juries—decide what duty a defendant owes is to ensure that all similarly situated defendants are treated equally and, more importantly, to give notice of these duties so that potential defendants will have an opportunity to adjust their conduct accordingly. These principles of fair notice and equal treatment are fundamental values in our legal system. Courts are well positioned to serve and protect such values; juries are not." *Id.* (citing William Prosser, *HANDBOOK OF THE LAW OF TORTS*, at 236 (1941)) (noting that "it is no part of the province of the jury" to weigh the considerations of precedent and sound public policy that inform decisions regarding the existence and extent of a defendant's duty of care).

In addition, "[t]here is a special relationship between hotel operators, whom the law has traditionally called innkeepers, and their guests, so as to impose affirmative duties in the protection of persons and property." *Virginia D. v. Madesco Corp.*, 648 S.W.2d 881, 886-87 (Mo. banc 1983). This duty encompasses more than the duty normally owed by a business to an invitee. *Id.* This is because guests entrust themselves to the protection of innkeepers and rely upon them to provide a place of safety. *Garrett v. Impac Hotels, L.L.C.*, 87 S.W.3d 870, 873 (Mo. App. E.D. 2002) (citation omitted). Missouri law also recognizes that "[a]ny suggestion that crime is not foreseeable is particularly inappropriate when a downtown metropolitan area is involved, especially when the case involves a hotel." *Virginia D.*, 648 S.W.2d at 887.

18

Finally, the Supreme Court of Missouri has adopted Restatement (Second) of Torts 317 (1965)'s detailed definition of the duty element in a negligent supervision claim. *Gibson v. Brewer*, 952 S.W.2d 239, 247 (Mo. banc 1997) ("Negligent supervision implicates the duty of a master to control conduct of a servant[.]"). Section 317, under a heading titled "Duty to Control Conduct of Third Persons," defines the duty element of a negligent supervision claim *when* a servant is acting *outside* the scope of his employment:

"A master is under the duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them if:

(a) the servant (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or (ii) is using a chattel of the master, and

(b) the master (i) knows or has reason to know that he has the ability to control his servant, and (ii) knows or should know of the necessity and opportunity for exercising such control."

*Restatement (Second) of Torts,* sec. 317 (1965).

It is not lost on us that Restatement (Second) of Torts, section *314A*, located just three sections before the provision at issue here, sets forth an innkeeper's duty to protect its guests from unreasonable risk of physical harm. Thus, we observe that Section 317's duty determination when a servant acts outside the scope of his employment dovetails into the heightened duty to Dugan that Missouri law imposes on Hyatt as Dugan's innkeeper and fully encapsulates the duty element in this case.

19

## C. Analysis

In light of the foregoing authorities, we reject Hyatt's argument that the verdict directors should have required the jury to determine whether D.W. acted outside the scope of employment and whether Hyatt had the ability and should have foreseen the need to control D.W. Again, these were undisputed factual questions that Hyatt repeatedly conceded such that they were simply part of the trial court's duty determination as a matter of law. *Clair v. Monsanto Co.*, 412 S.W.3d 295, 304 (Mo. App. E.D. 2013); *Duncan v. First State Bank of Joplin*, 848 S.W.2d 566, (Mo. App. S.D. 1993) ("[C]ourts must determine on a case by case basis what are the ultimate facts that must be submitted and what are unnecessary evidentiary details to be excluded.").

Hyatt principally relies on *Gibson*, 952 S.W.2d at 247, for its argument that the verdict directors should have required the jury to find whether D.W. acted outside the scope and whether Hyatt knew or should have known of the necessity and opportunity to control D.W. In *Gibson*, the Supreme Court adopted section 317 as the definition of the duty element in a negligent supervision claim; specifically, when the master has a *duty* to control a servant if that servant acts outside the scope of his employment. *Id.* ("Negligent supervision implicates the duty of a master to control conduct of a servant.").

Hyatt's argument, however, departs from *Gibson's* core holding that section 317 defines the duty element and instead seeks to convert the two key prongs of section 317's definition of duty into elements of the negligent supervision cause of action so as to require that they always be included as ultimate facts in the verdict directors. In Hyatt's defense, this confusion is also found in this Court's opinion in *Reed v. Kelley*, 37 S.W.3d 274, 278 (Mo. App. E.D. 2000), a case upon which Hyatt also heavily relies.

And we conclude that certain imprecise language in *Reed* has spawned Hyatt's argument. *Reed* cites section 317 as if it sets forth all the elements of a negligent supervision cause of

20

action. *Id.* Specifically, *Reed* prefaces its full quote of section 317 with the phrase "[a] cause of action for negligent supervision may be established when: …". *Id.* at 278. *Reed* cites to *Gibson* and *Conroy v. City of Ballwin,* 723 S.W.2d 476 (Mo. App. E.D. 1986), but neither case stands for the proposition that section 317 supplies *all* the elements of the negligent supervision tort. *See Conroy,* 723 S.W.2d at 479 (plaintiff failed to satisfy section 317's requirements in order "to establish a duty" on the part of the master.).

Thus, to the extent *Reed* may be construed to mean that section 317 supplies any other element than the duty element in a cause of action against an employer for the tortious conduct of a servant, we no longer follow *Reed.* Instead, the Supreme Court's decision in *Gibson* remains controlling.

So, by submitting these negligent supervision claims, the trial court necessarily found as a matter of law that the record established that Hyatt owed Dugan the duty to supervise D.W. as he acted outside the scope of his employment when he sexually assaulted her. Hyatt repeatedly and consistently admitted those underlying facts. In its answer, Hyatt claimed that "[a]ny injury or damages alleged to have been suffered by Plaintiff, which damages and injury Defendant denies, were caused in whole or in part by others not under Defendant's control and not acting within the course and scope of employment with Defendant Hyatt." Further, that "[p]laintiff's claims are barred as the sole cause of the incident at issue was the intentional and criminal conduct of Defendant [D.W.] which was done of his own motivation and for his own purposes and not in the course and scope of his employment with Defendant Hyatt[.]" Then, Hyatt submitted sworn discovery answers in which it denied D.W. acted within the scope. In its summary judgment motion, Hyatt argued it was not liable because D.W. acted outside the scope. And finally, during trial, Hyatt repeatedly took the position that D.W.'s outside-the-scope assault

21

was the sole cause all the way through closing argument when Hyatt described the assault as D.W.'s "intentional criminal decision."

As for the second prong of section 317, Hyatt also admitted that it knew it had the ability, the necessity, and the opportunity to control and supervise D.W. particularly since he had a master key to all guest rooms. Security Director, Hyatt's corporate representative, admitted it was Hyatt's responsibility to properly supervise its security guards. Security Director agreed that "[y]ou have to make sure they're [security guards] supervised properly. Hyatt has to make sure they're [supervised] properly to make sure they don't do anything to endanger the safety of a guest." Further, that "Hyatt needs to take every step to take care of their guests and make sure they're safe and they are not harmed while on the premises." Security Director added that Hyatt's written security policies designed for this purpose were not followed in this case.

So then, the question becomes whether these verdict directors accurately set forth the remaining three elements of Dugan's negligent supervision causes of action – that is, breach, causation, and damages. We find that they do.

"Negligent supervision is a variant of the common law tort of negligence." *O.L. v. R.L.*, 62 S.W.3d 469, 474 (Mo. App. W.D. 2001). "To successfully prove the tort of negligent supervision, a plaintiff must plead and prove the following: (1) a legal duty on the part of the defendant to use ordinary care to protect the plaintiff against unreasonable risks of harm; (2) a breach of that duty; (3) a proximate cause between the breach and the resulting injury; and (4) actual damages to the plaintiff's person or property." *Davis v. Lutheran South High School Ass'n of St. Louis*, 200 S.W.3d 163, 165-66 (Mo. App. E.D. 2006).

We find Instructions 10 and 14, the verdict directors here, accurately track the remaining three elements for the jury's determination. Paragraphs First, Second, and Third of both instructions accurately present the *breach* element of the tort. There the jury was asked to

22

determine whether Hyatt negligently failed to supervise D.W. by (1) failing to require that at least two employees performed the wellness check of Shannon Dugan, or (2) to require that after the wellness check of Shannon Dugan her room was secured with a security latch, or (3) to require that they always awaken or rouse the guest or if the guest cannot be awakened, to call for medical assistance. And Paragraph Fourth properly presents the *causation* and *damages* elements with the amount of damages to be entered on the verdict form – "such failure directly caused or directly contributed to cause damages to Plaintiff Shannon Dugan."[5] Point denied.

*Point Four*

Point four concerns the submissibility of punitive damages on Dugan's claims for Hyatt's negligent supervision of D.W., the negligent training of its security personnel, and the negligent supervision of its security personnel other than D.W. We note again that while the jury found Hyatt liable on Dugan's negligent hiring claim, it found punitive damages unwarranted on that claim. Yet, Hyatt has tied its argument here to the evidence of D.W.'s criminal history as if that evidence played any role in the jury's punitive damages decision on the negligent supervision and negligent training claims. It did not. D.W.'s criminal history was properly admitted – see point one – on the dangerous-proclivities element of the negligent hiring claim and that element is not part of the negligent supervision and negligent training claims. *Gaines v. Monsanto Co.*, 655 S.W.2d 568, 571 (Mo. App. E.D. 1983).

Moreover, Hyatt's argument here is inconsistent with its position at trial. In its argument to the jury before they left to deliberate on punitive damages, Hyatt told the jury that "[t]he

---

[5] We likewise reject Hyatt's roving commission argument. An instruction is a roving commission if it fails to advise the jury which of the defendant's acts or omissions would result in a finding of liability. *Bell v. Redjal*, 569 S.W.3d 70, 94 (Mo. App. E.D. 2019). These verdict directors were not roving commissions because "plaintiff's theory of the case is supported by the evidence and the instruction submits ultimate facts which define for the jury the plaintiff's theory of negligence[.]" *Id.* at 95.

23

counts that you returned for punitive damages are all negligent supervision, negligent training" and that they should tailor their punitive damages determination to "policy questions about this hotel and how this hotel operates." This jibed with Dugan's counsel's argument that punitive damages were warranted "based on the welfare check here, [on the] failure to train and supervise [claims]." Thus, neither party urged the jury to consider D.W.'s criminal history in its punitive damages deliberations. In carving out the negligent hiring claim from its punitive damages finding, this jury appears to have demonstrated an understanding of the differences among the claims before it.

Thus, the question here is whether, in connection with the two negligent supervision claims and the negligent training claim, there was sufficient evidence rising to the clear and convincing standard that Hyatt "showed complete indifference to or conscious disregard for the safety" of Dugan.

*Standard of review for submission of punitive damages*

"The standard of review of a trial court's denial of motions for directed verdict and judgment notwithstanding the verdict are treated the same." *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 711 (Mo. App. E.D. 2020). "We must determine whether the plaintiff made a submissible case." *Id.* (internal quotations omitted). "Whether there is sufficient evidence to support an award of punitive damages is a question of law, and this Court's review is *de novo*." *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 520 (Mo. banc 2009). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict. *Rhoden*, 621 S.W.3d at 477.

Punitive damages are designed to inflict punishment and to serve as an example and a deterrent to similar conduct. *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996). To recover punitive damages in a negligence action, "the plaintiff must demonstrate that the defendant

24

showed a complete indifference to or conscious disregard for the safety of others." *Ingham*, 608 S.W.3d at 714 (quoting *Poage v. Crane Co.*, 523 S.W.3d 496, 515 (Mo. App. E.D. 2017)). This claim must be proven by clear and convincing evidence. *Id.* "[C]lear and convincing evidence is that which tilts the scales in the affirmative when weighed against the evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Id.* at 714-15 (quoting *Cook v. Polineni*, 967 S.W.2d 687, 690-91 (Mo. App. E.D. 1998)). In determining whether a plaintiff has met his or her burden, a court must consider "whether the evidence—giving full play to the jury's right to determine credibility, weigh the evidence and draw justifiable inferences of fact—is sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference. *Id.* at 715 (quoting *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 25 (Mo. App. W.D. 2006)).

Here, the relevant record, largely consisting of Hyatt's own testimony and affirmative admissions, supports the submission of punitive damages on these claims.

*Hyatt's pre-assault conduct*

In *Porter v. Erickson Transport Corp.*, 851 S.W.2d 725, 746 (Mo. App. S.D. 1993), the court held that evidence an employee who installed a pump on a tractor that later exploded in the tractor driver's face had not been properly trained or qualified to do such installation indicated the employer's complete indifference or conscious disregard for the safety of others since "failure to properly train an employee to perform a task that, if improperly performed, threatens death or serious harm can suffice as a basis to award punitive damages."

Spread across this record are Hyatt's admissions by its employees and by the representative it designated to testify on its behalf as to its knowledge, its policies, and its culpability relevant to Dugan's negligent supervision and training claims. One of which is that

25

Hyatt security guards "hold an important position with substantial responsibility and trust" and that "Hyatt needs to take every step to take care of their guests and make sure they're safe and they are not harmed while on the premises." Hyatt admitted that D.W. and the other security guards should have been – but were not – trained on Hyatt's policy that required two security guards to perform wellness checks on guests. This was illustrated on the night of the assault when Supervisor dispatched D.W. alone to Dugan's room despite the availability of two other security guards, one of which went out to smoke. Hyatt's corporate representative then admitted that due to Hyatt's failures to follow its own policy in this regard, Dugan was sexually assaulted by a security guard Hyatt knew they needed to supervise.

We find that this evidence satisfies Dugan's clear and convincing burden because it immediately tilts the scale that Hyatt "showed a complete indifference to or conscious disregard for" her safety under the circumstances of this case in which Hyatt entrusted a master key to its guests' room to security guards that it did not train and did not supervise.

*Hyatt's post-assault conduct*

The jury then heard evidence of Hyatt's troubling conduct *after* the assault in which Hyatt did not fully cooperate with the police investigation and even interfered with it. "Our courts have routinely upheld punitive damages awards based on cover-up activities that occurred after the conduct causing the underlying harm." *DeLaRosa v. Farmers State Bank S/B*, 474 S.W.3d 240, 247 (Mo. App. W.D. 2015).

Hyatt's policies required it to assist victims of crimes that occur on hotel property, to assist them in reporting the crimes to police, and to cooperate with police investigations. Yet here, on the morning after the assault when Dugan came down to the lobby to try to figure out what had happened and how she came to be D.W.'s victim, Hyatt had already begun conducting its own investigation by gathering key information to which only Hyatt had access, including the

26

surveillance video linking D.W. to the crime scene and the key and lock interrogation records that showed D.W. had used the key to enter Dugan's room to commit the assault. But Hyatt refused Dugan's request for the information. It even refused to allow Dugan to take a photograph of the record. Instead, Hyatt told Dugan she would have to get a subpoena.

Hyatt's treatment of Dugan carried over to its interaction with the police. Hyatt's general counsel at its headquarters in Chicago, who also served as Hyatt's chief risk management executive, told Hyatt's on-site security director that Hyatt should not cooperate with the police by voluntarily providing the police with the information and materials they sought which Hyatt had already gathered. Instead, Hyatt told police to get a subpoena.

In fact, the jury heard that Hyatt did not just fail to voluntarily assist police, but Hyatt hindered the police's investigation. When Hyatt's general counsel learned that police had requested that Hyatt refrain from questioning D.W. about the matter before the police could do so, she told Hyatt's people in St. Louis that "Hyatt could interview him whenever they wanted." Then, when Hyatt learned that D.W. planned to leave town the day after the assault, Hyatt did not relay this information to police despite knowing the police were trying to track him down. Again, at this point Hyatt knew that D.W.'s master key had opened Dugan's door around the time of the assault and it knew that hotel surveillance video captured him fleeing the scene.

In our judgment, Hyatt's conduct in this regard epitomizes a conscious disregard for the rights and interests of its own hotel guest who suffered a sexual assault in her hotel room at the hands of Hyatt's own security guard. Instead of following its policies and putting Dugan's interests first, the jury appears to have concluded that Hyatt, from the top of its corporate governance, prioritized its own interests. This evidence supports the conclusion that the trial court properly submitted punitive damages to the jury. *DeLaRosa*, 474 S.W.3d at 247.

27

## Conclusion

For the foregoing reasons, we affirm the trial court's judgment.

_____
James M. Dowd, Judge

Thomas C. Clark, II, C.J., and
Renée Hardin-Tammons, J., concur.